UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. 21-CR-210 (RDM) |
| : | |
| v. : | |
| : | |
| JAMES COLEMAN, : | |
| : | |
| Defendant : | |
| : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. For the reasons herein, the United States requests that the Court sentence the defendant to a period of 360 months of incarceration on Counts One and Four, to be served concurrently, followed by twenty-five years of supervised release, $20,000 restitution to MV-1 as agreed to in the Plea Agreement, and forfeiture as outlined in the Plea Agreement. The Government further recommends that the Court sentence the defendant to a period of 114 months of incarceration on Count Eight, to run concurrently to Counts One and Four.

Additionally, the defendant is required to register as a sex offender for a minimum period of 25 years pursuant to the Sex Offender Registration and Notification Act, 18 U.S.C § 2250, 34 U.S.C. §§ 20911(3), and 20915(a)(2), and to register as a sex offender in the District of Columbia for a period of 10 years, pursuant to 22 D.C. Code §§ 4001, 4002.

**I.     BACKGROUND**

On July 15, 2021, a superseding indictment was filed in the United States District Court for the District of Columbia, charging the defendant with the following violations: Conspiracy – Sex Trafficking of a Minor, in violation of 18 U.S.C §§ 1591(a) and 1594(a) and (c); Sex

1

Trafficking of a Minor, in violation of 18 U.S.C § 1591(a); Coercion and Enticement of a Minor, in violation of 18 U.S.C §§ 2422(2), 2; Sexual Exploitation of a Child, in violation of 18 U.S.C § 2251; Possession of Child Pornography, in violation of 18 U.S.C §§ 2252(a)(4)(B); Sex Trafficking by Force, Fraud, and Coercion, in violation of 18 U.S.C §§ 1591(a)(1) and (b)(1); First Degree Child Sex Abuse, in violation of 22 D.C. Code § 3008; Kidnapping While Armed, in violation of 22 D.C. Code §§ 2001, 4502; and Assault with a Dangerous Weapon, in violation of 22 D.C. Code § 402. Defendant Coleman was arraigned on the superseding indictment on July 26, 2021. The government later moved to dismiss count 3 (Coercion and Enticement of a Minor).

The defendant was originally arrested on October 22, 2020, and has been held without bond since. On May 17, 2022, the defendant pled guilty to Conspiracy – Sex Trafficking of a Minor, in violation of 18 U.S.C §§ 1591 and 1594(c) (Count One); Production of Child Pornography, in violation of 18 U.S.C. § 2251(a) (Count Four); and First-Degree Child Sexual Abuse, in violation of 22 D.C. Code § 3008 (Count Eight).

**II.     THE OFFENSE CONDUCT**

As outlined in the Statement of Offense, defendant James Coleman and co-conspirator Taiwan Williams (21-CR-373 (RDM)) worked together with the goal of trafficking MV-1 for commercial sex, that is knowingly recruiting, enticing, harboring, transporting, providing, obtaining, and maintaining MV-1 for MV-1 to engage in sex acts with male customers in exchange for receiving anything of value including money from them. defendant Coleman conspired with Williams to cause MV-1 to engage in commercial sex acts for money, where he knew or should have known or had reasonable opportunity to observe that she was under the age of 18, took sexually explicit photographs and videos of MV-1, where he knew or should have known or had reasonable opportunity to observe that she was under the age of 18, and, being at least 18 years of

2

age and at least four years older than MV-1, engaged in sexual acts with her when she was under the age of 16, as outlined further below.

On June 6, 2020, MV-1, a fourteen-year-old girl with a date of birth in 2005, disappeared from her residence in Pulaski, Virginia. A missing person's flyer identifying her date of birth, age, and hometown was disseminated. In late June of 2020, when MV-1 was homeless in Southeast D.C., MV-1 connected with defendant Coleman via Instagram. defendant Coleman offered to give MV-1 a phone, clothes, and a place to stay if she agreed to work for him engaging in commercial sex acts for money. On June 30, 2020, defendant Coleman sent Taiwan Williams to pick MV-1 up from Southeast D.C. and bring her to his residence at 4XXX Reed Terrace Southeast, Washington, D.C.

Defendant Coleman began taking affirmative steps to have MV-1 engage in sexual acts with men in exchange for money as soon as she came to stay with him. Among other things, he worked with Taiwan Williams to post advertisements for commercial sex featuring MV-1 on platforms such as "skipthegames.com," a site where users can search for sex workers for hire. MV-1 was advertised on websites targeting potential customers in the Maryland, Virginia, and Washington, D.C. areas. Defendant Coleman used these websites to set up "dates" for MV-1 where she would meet with men and engage in commercial sex. Defendant Coleman told MV-1 to go by the name "Brooke" because that was the name that he was using for her in online advertisements. defendant Coleman also directed MV-1 to tell people that she was 21 years old and instructed her to always use a condom when engaging in commercial sex. Within a day of MV-1 coming to stay with defendant Coleman, he reported to Williams, in substance, that MV-1 had already been hired for a "date."

Law enforcement later found several advertisements posted of MV-1 for "Brooke" dated

June 30, 2020, on the website skipthegames.com. These advertisements provided Google voice phone number 240-XXX-5378. The subscriber and Gmail user for this number was listed as an individual with MV-1's first name followed by the word "finest." The account and Google voice number were created on the day the ads were posted, which was June 30, 2020. The Gmail account recovery number was a different number, 202-XXX-9488, a phone number that open-source databases revealed came back to a relative of defendant Coleman and to defendant Coleman's address at 4XXX Reed Terrace Southeast, Washington, D.C. The "skipthegames" account used to post the ads was also connected to an email address ending in "suxxx" and phone number (202) XXX-2266, both linked to Taiwan Williams.

When defendant Coleman was trafficking MV-1, he gave her directions regarding how much to charge for sexual services, with specific monetary amounts for increments of time she spent with the commercial sex customers. His instructions included charging 120 dollars for fifteen minutes, 150 dollars for thirty minutes, 200 dollars for one hour, and 1,000 for an "overnight." defendant Coleman also accepted payment for sexual services that MV-1 provided on these dates through "Cash App," which is a mobile payment application that allows users to transfer money to one another through their phones. Defendant Coleman made MV-1 give him all the money that she made, telling her that he would "hold it" and saying, "give it here," or words to that effect.

By June 30, 2020, defendant Coleman had seen a Missing Person flier for MV-1 on Instagram. The flier stated that she was missing since June 6, 2020. The flier included her true name, stated that she was fourteen years of age, included two photographs, and indicated the location from where MV-1 was missing. Initially, defendant Coleman told Williams that he was no longer working with MV-1. However, on July 7, 2020, defendant Coleman asked Williams to put the online commercial sex advertisements featuring MV-1 back online. In text messages,

Williams told defendant Coleman "be careful bro, I think she a minor." Defendant Coleman responded by saying, "That's why I Said My Younging Gon Work Her." Several hours later, defendant Coleman reached out to Williams to verify that Williams had put the ad featuring MV-1 back online, and Williams confirmed that he did. From approximately July 7, 2020, until July 13, 2020, defendant Coleman continued to traffick MV-1.

On June 30, 2020, at approximately 11:51 p.m., defendant Coleman used his cell phone to record a video of himself engaging in sex acts with MV-1, including vaginal/penile penetration and fellacio. At some point while defendant Coleman was recording the video, his phone captured a still image of himself orally penetrating MV-1's mouth with his penis. In the video, defendant Coleman can be heard giving MV-1 directions, including telling her to spit on his penis. The video and still image referred to in this paragraph meet the federal definition of child pornography. The cell phone used was not manufactured in the District of Columbia. When defendant Coleman engaged in these sexual acts with MV-1, that is, penetration of MV-1's vulva with defendant Coleman's penis and contact between MV's mouth and defendant Coleman's penis, defendant Coleman was more than 18 years of age, was four years older than MV-1, and MV-1 was a child under sixteen years of age, that is, 14 years of age.

In addition to the image and video referenced above, a few hours later, on July 1, 2020, at 3:57 a.m., defendant Coleman used a cell phone to take a photograph of MV-1 naked from the waist down. In the photo, MV-1 is sitting with her legs spread open and is manipulating her vagina with her finger. The focal point in the photograph is MV-1's vagina. This photograph meets the federal definition of child pornography. Seconds later, defendant Coleman used a cell phone to take a second photograph, this time of MV-1 naked from the waist down, posed in a sexually

explicit position, bent over on a couch such that her vagina and anus were exposed. In this image, she is positioned so that the focal point is her anus and vagina.

On July 9, 2020, defendant Coleman used his cell phone to record a video of himself engaging in sex acts with MV-1, including penetration of MV-1'a vulva by his penis. The cell phone used was not manufactured in the District of Columbia. The video referred to in this paragraph meets the federal definition of child pornography.

On or about July 13, 2020, MV-1 made approximately 150 dollars for defendant Coleman by engaging in commercial sex acts. That night, defendant Coleman came to her room and asked her for 40 dollars. MV-1 refused and told defendant Coleman that he had money on his phone. Defendant Coleman became angry and told MV-1 to get out. He took MV-1's phone and told her that he was keeping her clothes and taking her money. Defendant Coleman told MV-1 that he was going out to have a cigarette, and when he returned, she needed to give him the money. Defendant Coleman put something in or near the door so that he would be able to hear if MV-1 attempted to leave. When defendant Coleman returned and MV-1 still refused to give him the money, defendant Coleman began pulling MV-1's hair and pushing her to the ground. Defendant Coleman then punched MV-1 in the face. MV-1 grabbed a broomstick and hit defendant Coleman with it. Defendant Coleman took the broomstick from MV-1 and used it to hit her. Defendant Coleman ripped MV-1's shirt and bra off her body. When defendant Coleman did this, MV-1 took her own pants off to prevent defendant Coleman from cutting them as well. Defendant Coleman then threw MV-1 out of the apartment. Defendant Coleman was the initial aggressor, has no legally valid self-defense claim, acted with the intent to assault MV-1. During the assault, defendant Coleman prevented MV-1 from being able to move by holding her and assaulting her with the intent to take money from her.

Shortly after this incident on July 13, 2020, defendant Coleman messaged Williams and said, "Man I Think I Fucked Her Jaw Up." He stated, "Man She Gone I Stripped Ass Naked and Sent Her On Her Way." Williams warned defendant Coleman he can get in trouble for that and says, "That's y I wanted to train her. U gotta have patience. Where she at." Williams told defendant Coleman, "Ima try to come thru the back and try to scoop her. I got her ig [Instagram]." Defendant Coleman responded, "I Know It was Da Money I Ain't Gon Lie That Shit was Too Lucrative I Stopped Thinking and Just Started Spending." Later that same day, he told Williams that, "She Hit Me With This Bat Joint And Lost It Gave Her to Joint To the Jaw That's It's She Tried to Scream Couldn't Even Do It That's Why I Said I Prolly Fucked Her Jaw Up." Defendant Coleman then sent additional messages about what he had done.

A few days later, July 15, 2020, Williams and defendant Coleman had a general conversation about partnering as "pimps." Williams gave additional advice to defendant Coleman. Williams then reached out to MV-1 and began trafficking her.

### III.    THE ADVISORY GUIDELINES RANGE AND PLEA AGREEMENT

The defendant's advisory U.S.S.G. guidelines range is 360 months of incarceration to life imprisonment on Counts One and Four. The defendant faces a mandatory minimum term of 15 years' incarceration on Count Four. The defendant's advisory D.C. Voluntary Sentencing Guidelines range is 114 - 204 months of incarceration on Count Eight.

In line with the Plea Agreement, the government recommends a sentence of 360 months of incarceration on Counts One and Four, the low end of the defendant's guidelines range, to run concurrently with a 114-month term of incarceration on Count Eight.

## IV. SENTENCING RECOMMENDATION

The following Section 3353(a) factors support the government's recommendation of 360 months' incarceration – the low end of the defendant's Guidelines range.

### A. The Nature and Circumstances of the Offense and the Defendant's Characteristics

The nature and circumstances of the offense and the defendant's characteristics warrant the prison sentence the government recommends. The defendant preyed on a vulnerable young girl who had limited social resources, funds, or places to live. He put MV-1 in danger by putting her in vulnerable situations where she was forced to have sex with strangers in various locations. The law recognizes how serious the sexual coercion and exploitation of children is and imposes stiff mandatory minimum sentences for offenders who engage in the conduct that the defendant stands convicted of.

There is a compelling interest in protecting children from this type of exploitation because children who are sexually abused often suffer serious physical and mental health issues. Additional studies suggest that early trauma, including sexual abuse, may interfere with brain development, and can produce various neuropsychiatric symptoms commonly associated with drug use. *See* Anderson, C.M., Teicher, M. H., Polcari, A., & Renshaw, P.F. (2002): Abnormal T2 relaxation time in the cerebellar vermis of adults sexually abused in childhood: Potential role of the vermis in stress-enhanced risk for drug abuse. *Psychoneuroendocrinology*, *27*, 231-244; Baynard, V.L., Williams, L. M., & Siegel, J.A. (2001): The long-term mental health consequences of child sexual abuse: An exploratory study of the impact of multiple traumas in a sample of women. *Journal of Traumatic Stress*, *14*(4), 697-715 (noting that child sexual abuse victims reported a lifetime history of more exposure to various traumas and higher levels of mental health symptoms). Other studies have found that individuals who suffer sexual abuse in their childhood years have a higher rate of

anxiety, disruptive behaviors, substance abuse, and personality disorders compared to others who may have experienced other forms of abuse or neglect. *See* Cohen, P., Brown, J., & Smailes, E. (2001): Child abuse and neglect and the development of mental disorders in the general population. *Development and Psychopathology*, *13*, 981-999; Dube, S.R., Anda, R.F., Felitti, V.J., Chapman, D.P., Williamson, D.F., & Giles, W,H, (2001): Childhood abuse, household dysfunction, and the risk of attempted suicide throughout the life span: Findings from the adverse childhood experiences study. *JAMA*, *286*(24), 3089-3096 (noting that a powerful relationship exists between adverse childhood experiences and risk of attempted suicide through the life span); Merrill, L. L., Thomsen, C.J., Sinclair, B. B., Gold, S.R., & Milner, J. S. (2001): Predicting the impact of child sexual abuse on women: The role of abuse severity, parental support, and coping strategies. *Journal of Consulting and Clinical Psychology*, *69*(6), 992-1006 (child sexual abuse is a significant predictor of long-term psychological difficulties ranging from depression and anxiety to sexual problems and dissociative symptomatology). Research also indicates that sexually abused adolescents are at an increased arrest rate for sex crimes and prostitution and are at an increased risk for earlier pregnancy. *See* Putnam, F. W. (2003): Ten-year research update review: Child sexual abuse. *Journal of the American Academy of Child and Adolescent Psychiatry*, *42*(3). Indeed, the consequences that children and adolescents suffer as a result of being sexually abused and exploited by adults are often devastating and lifelong.

      As outlined above, the defendant trafficked MV-1 knowing that she was 14-years old at the time. Further, the defendant himself sexually abused MV-1, knowing her age, and filmed it. The defendant also used violence against MV-1 and, following a dispute regarding money, assaulted her with a knife, cut off her clothing, and left her nude in the hallway of his building. The defendant's use of violence and willingness to not only take advantage of a minor child by

having sex with her and having her perform fellatio on him, but to profit from a minor child having sex with strangers over a period of weeks is extremely troubling and warrants a guidelines sentence.

### B. Protecting the Public and Adequate Deterrence

When fashioning an appropriate sentence, courts should consider that sex offenders have a high rate of recidivism. *See Lombard v. United States*, 44 F. Supp. 3d 14, 26 (D.D.C. 2014) (noting that the lower court's concerns about recidivism was supported by substantial authority (citing *Smith v. Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("The risk of recidivism posed by sex offenders is frightening and high.") (citations omitted); *McKune v. Lile,* 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); *United States v. Irey,* 612 F.3d 1160, 1214 (11th Cir.2010) ("[T]he threat of recidivism by a pedophile who has sexually abused a child is appalling.") (citation and quotation marks omitted); *United States v. Allison,* 447 F.3d 402, 405–06 (5th Cir.2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.").

The recommended sentence is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and to adequately deter similar conduct. *See* 18 U.S.C. § 3553(a)(2)(A) & B & (a)(6). The Sexual Exploitation of Children is a horrific offense that has lifelong, devastating effects on the victims. Sex trafficking of young, vulnerable girls is a crime that is both prevalent because it is so profitable and because it is incredibly difficult to investigate and prosecute. Unlike drugs or other commodities, commercial sex can be sold again and again. Because prostitution is illegal, and due to the control

perpetrators exert over their victims, victims are reluctant to report to law enforcement, which makes detection less likely. Many victims have substance abuse issues, criminal histories, or ties to the trafficker that make prosecution difficult. Traffickers sometimes assume that if they are prosecuted, the victims will either not show up for court or, if they do, no one will believe their stories.

Because of the seriousness of these offenses, courts across the country have issued sentences beyond that requested by the government here to ensure adequate deterrence. *United States v. Curtis*, 1:03-cr-00533 (D.D.C) (court issued life sentence to defendant convicted of two counts of sex trafficking a minor and two counts of transporting a minor for purposes of prostitution, where defendant had an offense level of 43 and a criminal history category of III); *United States v. Mearis*, 4:19-cr-00524 (S.D. Tx.) (court issued life sentence for defendant convicted at trial of five counts of sex trafficking a minor and sex trafficking by force, fraud and coercion, and issued a restitution order in the amount of $921,680 for three victims); *United States v. Sanders, et. al.*, 4:17-cr-00264 (N.D. Tx.) (court issued life sentence to defendants convicted of sex trafficking of a minor and conspiracy to sex traffick minors, where both defendants had an offense level of 43 and a criminal history category of II); *United States v. Nash, et al.*, 3:15-cr-00478 (N.D. Tx.) (court issued life sentence for defendant convicted of sex trafficking by force, fraud, and coercion, sex trafficking of minors, conspiracy to commit sex trafficking, interstate transportation of a minor, and felony possession of a firearm, where defendant's offense level was 40); *United States v. Williams*, 9:18-cr-80053 (S.D. Fl.) (court issued life sentence for defendant convicted of two counts of sex trafficking of a minor, three counts of sex trafficking by force, fraud, and coercion, and one count of obstruction of sex trafficking enforcement, where defendant had an offense level of 40 and was in criminal history category I); *United States v. Stapleton*, 2:18-

cr-20028 (C.D. Ill.) (court issued life sentence for defendant who pled guilty to four counts of sex trafficking by force, fraud, and coercion, where the defendant's offense level was 43 and his criminal history category was IV). Therefore, a sentence of 360 months in prison would properly reflect the seriousness of the offense and provide just punishment and adequate deterrence.

### C. Restitution

The defendant is required to pay restitution to MV-1 pursuant to 18 U.S.C. § 1593, payable in an amount as the Court imposes. Indeed, restitution in this case is mandatory by law. Congress has provided, in the case of any offense under Chapter 77 of Title 18, which includes sex trafficking in violation of § 1591, that the Court "*shall* order restitution." 18 U.S.C. § 1593 (emphasis added). The restitution order "shall direct the defendant to pay the victim...the full amount of the victim's losses." *Id*. at (b)(1). As outlined in the Plea Agreement, the parties agree that the defendant shall pay restitution to MV-1 in the amount of $20,000.

### D. Forfeiture

The government asks the Court to sign an Order of Forfeiture that will require the defendant to forfeit all property that was intended to be used or was used in the commission of the offenses, as outlined in the Plea Agreement.

### E. Requirement to Register as a Sex Offender

The convictions that the defendant sustained in this case require him to register as a sex offender for 25 years pursuant to the Sex Offender Registration and Notification Act, 18 U.S.C § 2250, 34 U.S.C. §§ 20911(3), and 20915(a)(2), and to register as a sex offender in the District of Columbia for a period of 10 years, pursuant to 22 D.C. Code §§ 4001, 4002.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the requested sentence.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
District of Columbia


 /s/
Meredith E. Mayer-Dempsey
NY Bar No. 5213202
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street, Northwest
Washington, D.C. 20530
(202) 252-7259
Meredith.Mayer-Dempsey@usdoj.gov